Knights of the Ku Klux Klan, Incorporated, Appellee, v. First National Bank et al., Appellants.*

Gen. Nos. 8,117 and 8,128.

---

* The opinion in this case which was originally published as an abstract in 249 Ill. App. 658, is now, by the court's direction, reported in full.

Opinion filed January 25, 1928. Refiled April 12, 1928. Rehearing denied April 12, 1928.

THOMAS W. HOOPES and L. E. STONE, for appellants.

W. F. ZUMBRUNN, W. B. BROWN, J. H. CONNAUGH-TON and B. H. SULLIVAN, for appellee.

MR. PRESIDING JUSTICE SHURTLEFF delivered the opinion of the court.

We shall refer to the parties as complainant and defendants. This suit was based upon a bill in equity, praying that the defendants be required to account, an injunction and other relief. There was a hearing and a decree entered under date of July 8, 1925, finding and determining the rights of the parties and requiring the defendants to account. No appeal was prayed or taken from this decree. The cause was again referred to the master to hear the proofs and state an account, which resulted in proofs being taken, a second report by the master stating the account, and a decree under date of September 8, 1926, determining the account, and from this decree defendants have appealed and the same is now pending in this court. Thereafter, the defendants sued out a writ of error to bring

up the entire record, and said cause is now pending in this court as general number 8128. Defendants as plaintiffs in error have moved the court to consolidate the two causes, which motion has been allowed, while complainant (defendant in error) has moved to dismiss the writ of error upon the ground that the cause sought to be reviewed by writ of error was pending in this court upon appeal at the time the writ was issued, and that a writ of error will not lie to bring up a cause while an appeal is pending. The motion has been taken with the case. We cannot agree with complainant's contention. The two decrees, while growing out of the same cause of action, are separate, independent decrees and an appeal would lie from each. There is a distinction between an appeal and a writ of error. In a similar case, *Drummer Creek Drain. Dist. v. Roth,* 244 Ill. 68, 71, the court held: "A decree which finally fixes the rights of the parties must be appealed from within the time allowed by statute, and is not subject to review by an appeal from a later decree not involving such rights. (*Gray v. Ames,* 220 Ill. 251; *DeGrasse v. Gossard Co.,* 236 *id.* 73.) . . . 'A writ of error to a final judgment brings up the whole record.' (7 Ency. of Pl. & Pr. p. 899, and cases cited.) It has been held that a writ of error by one party brings up the entire record, and if any error exists to the prejudice of any party it may be corrected, whether it be in the judgment to which the writ of error was taken or in another in the same case. (*Morgan v. Ohio River Railroad Co.,* 39 W. Va. 17.) While this court has held that in partition proceedings the decree which finally adjudicated the rights and interests of the parties could not be reviewed on appeal from a later decree in the same proceeding which did not affect such interests of the parties (*Crowe v. Kennedy,* 224 Ill. 526; *Piper v. Piper,* 231 id. 75;), we have also permitted, in partition proceedings, the original decree fixing the rights of the parties and a later decree taxing costs against cer-

tain of the parties to be reviewed by one writ of error. (*Smith v. Roath*, 238 Ill. 247.) All the final orders complained of in these proceedings have properly been brought to this court by this one writ of error. To review them by one writ of error tends to prevent multiplicity of suits and simplifies litigation. Such a practice is in harmony with the authorities and supported by sound reason.''

It would seem to follow that the writ of error supplanted the appeal and brings up the entire record, and that complainant's motion should be denied.

From complainant's bill of complaint we conclude that complainant is not a corporation for pecuniary profit, but is purely beneficial and eleemosynary and is for the purpose of conducting a patriotic, secret, social benefit order. ''That its object is to unite white male persons, native born, Gentile citizens of the United States of America, who owe no allegiance . . . to any foreign government, nation, institution, sect, ruler, person or people, whose reputation and vocation are respectable, whose habits are exemplary, who are of sound mind and eighteen years or more of age, under a common oath into a brotherhood of strict regulations; to cultivate and promote patriotism towards our civil government; to practice and cultivate klanishness toward each other; to exemplify and practice benevolence; to shield the sanctity of the home and the chastity of womanhood; to maintain forever white supremacy; to teach and faithfully inculcate a high spiritual fellowship through an exalted ritualism, and by practical devotion to conserve, protect and maintain the distinctive institutions, rights, privileges, principles, traditions, and ideals of pure Americanism.''

That its said charter gives it power to confer initiative degrees, ritualism and so forth, that it has the right in itself to own and control the sale of paraphernalia, regalia, jewelry, materials, etc., used in said

order, to hold real and personal property for the purposes of the organization, to borrow money and make transactions, etc. The bill further alleges the general authority of the said Knights of the Ku Klux Klan and to delegate its powers.

It is alleged that in 1923 said complainant established a subordinate state branch or realm organization in the State of Illinois, which was authorized to create and establish local branches throughout the State; that by means thereof many members have become a part of said organization that has been established throughout the State, many local organizations, all subordinate state organizations with thousands of members; that the defendant, First National Bank, was made depository for Abraham Lincoln Klan No. 3 at Springfield, Illinois; and that it now has on deposit approximately $11,900 of the funds of Abraham Lincoln Klan No. 3; that certain of the defendants held respective offices in said Abraham Lincoln Klan No. 3 and carried out certain necessary ritualistic work incident to their said offices.

The charter powers of said complainant are set out in the bill of complaint, together with certain by-laws adopted by the organization as follows: Section twenty of article eighteen reads:

"A Klan under any and all circumstances shall accord full respect to its charter, and thereby strictly observe the Constitution and Laws, mannerisms, usages and Kloranic (ritualistic) regulations and requirements of this Order as the same are promulgated by the Imperial Wizard; and shall give due respect and obedience to all Imperial, Realm and Provincial decrees, edicts, mandates, rulings and instructions issued by the said officers; and failure on the part of a Klan to do so shall be cause for revocation of its charter and the suspension of its entire membership from this Order."

Section twenty-three of article eighteen provides:

"In the event the charter of a Klan has been revoked or cancelled for any cause whatsoever, and in the event of disbandment of a Klan, whether it be a chartered or provisional Klan, all monies of that Klan in the possession of any officer or member thereof shall automatically become the actual monies of the Imperial Treasury of this Order and same must be freely and promptly turned over on demand to the properly accredited officer who is authorized by the Imperial Wizard to receive same in the name of this Order; also all books, papers, manuscripts, Klorans, records, seals, Klan paraphernalia, regalia, robes, helmets and any and all other things used by the Klan, and all articles or things appertaining to this Order as may have been used by or are in the possession of any individual member thereof."

Section twenty-five of article eighteen provides:

"No Klan or member shall use the name of this Order or any part thereof for any purpose that contravenes in any manner the laws of the land, that will reflect or probably reflect; upon the reputation and good name, or compromise, or injure this Order, or any member thereof, in any way."

And section sixteen of article eighteen provides:

"When a Klan becomes in arrears in payment, of its Imperial, Realm or Provincial tax for a period of one hundred days, its several offices are automatically vacated, its members denied visiting privileges in other Klans, and its acts subsequent thereto are invalid unless the time is extended by the Grand Dragon in organized Realms, either of whom shall have the authority to order a complete audit of this Klan's affairs at the expense of the local Klan."

It was further alleged that the properly accredited officer authorized by the Imperial Wizard, to receive in the name of this Order, all the monies and other

property set forth in section twenty-three of article eighteen, *supra,* is Charles G. Palmer, denominated Grand Dragon, Realm of Illinois, Knights of the Ku Klux Klan, Inc. It was averred that Abraham Lincoln Klan No. 3 of Springfield, Illinois, was organized in pursuance of a charter granted by the complainant in and for the Realm of Illinois, and that one Charles G. Palmer of Chicago was the "Grand Dragon" of the "Realm of Illinois," having by appointment all of the power and privileges of the "Imperial Wizard, Knights of the Ku Klux Klan, Inc.," and that the said Abraham Lincoln Klan No. 3 had failed to pay and was in arrears in payment of its "Imperial Realm and Provincial tax," for a period of over three-quarters of a year and had seceded from said order; that said Abraham Lincoln Klan No. 3 had on hand funds and property properly belonging to said complainant and that due demand had been made for the same upon the issuing of the edict by the "Grand Dragon" in the following form, namely:

"OFFICIAL MANDATE, RULING, DECREE, INSTRUCTION OR EDICT No. 65.

"To THE EXALTED CYCLOPS, TERRORS AND MEMBERS OF ABRAHAM LINCOLN KLAN No. 3, LOCATED AT SPRINGFIELD, SANGAMON COUNTY, ILLINOIS;

AND

"To ALL GRAND DRAGONS, HYDRAS, GREAT TITANS, FURIES, GIANTS, KLEAGLES, KING KLEAGLES, EXALTED CYCLOPS AND TERRORS, AND CITIZENS OF THE INVISIBLE EMPIRE IN THE NAME OF OUR VALIANT AND VENERATED DEAD, I AFFECTIONATELY GREET YOU BY VIRTUE OF GOD'S UNCHANGING GRACE:

"WHEREAS, ABRAHAM LINCOLN KLAN No. 3, in the city of Springfield, Sangamon County, Realm of Illinois, has failed to accord full respect, mannerisms, usages and Kloranic (ritualistic) regulations and re-

quirements of this Order as same are promulgated by the Imperial Wizard;

"And to give due respect and obedience to all Imperial, Realm, and Provincial decrees, edicts, mandates, rulings and instructions, its failure to pay its Imperial, Realm or Provincial tax for the second, third and fourth quarters for the year 1923 last past, and for other good and sufficient reasons, as provided in our Constitution and Laws,

"Now, THEREFORE, I, CHARLES G. PALMER, GRAND DRAGON, REALM OF ILLINOIS, KNIGHTS OF THE KU KLUX KLAN, INC., by virtue of the authority vested in me by Dr. Hiram Wesley Evans, Imperial Wizard, Knights of the Ku Klux Klan, Inc., do hereby revoke the Charter of Abraham Lincoln Klan No. 3, located at Springfield, Sangamon County, Realm of Illinois;

"AND O. W. FRIEDERICH, POST OFFICE Box 17, PEKIN, ILLINOIS, is hereby directed to obtain from the officers and members of said Abraham Lincoln Klan No. 3, all property and funds belonging to the Knights of the Ku Klux Klan, Inc., and the officers and members of said Klan are directed to turn the same over to the said O. W. FRIEDERICH, POST OFFICE Box 17, PEKIN, ILLINOIS.

"Done in the Executive Chambers of the Grand Dragon, Realm of Illinois, Knights of the Ku Klux Klan, in the City of Chicago, County of Cook, and State of Illinois, on this the fourth day of March, A. D. 1924; and on the Dismal Day of the Weeping Week of the Frightful Month of the Year of the Klan LVII.

Faithfully yours,

In the Sacred Unfailing Bond,

Chas. G. Palmer,

GRAND DRAGON, REALM OF ILLINOIS."

(SEAL.)

but that said defendants had failed and refused to pay or turn over any of said funds or property. Other acts of misconduct by the defendants, tending to bring com-

plainant and its subordinate lodges into contempt and disrepute were charged, and it was charged that the defendants had in their possession paraphernalia, property and funds to the amount of about $11,900, and the bill prayed an injunction and accounting.

The defendants answered the bill, substantially admitting the charter and by-laws of the complainant order, but denied the right of the complainant to cancel the said charter without notice and an opportunity to defendants to be heard; denied that any notice was ever given to any of said defendants of "Edict No. 65," and denied all charges of misconduct against the defendants or either or any of them, and denied the possession of any funds or property belonging to the complainant.

We have omitted very much matter set up in the bill and answer and have attempted to cover only the substantial and salient issues in the case. There was a replication and the cause was referred to the master to take the testimony and report the same, together with his findings and conclusions to the court. The master heard the testimony and reported the same with his findings and conclusions in the following form:

"1. That the Court has jurisdiction of the subject matter of this proceeding and of all the parties hereto, both Complainant and Defendant.

"2. That the Complainant is a corporation, not for profit organized and existing under the laws of the State of Georgia, and operated as a Fraternal Organization under and by virtue of its Charter, and in obedience to a certain Constitution and by-laws a certified copy of which is herewith filed and reference made thereto.

"3. That on or about the 10th day of June, A. D. 1923, the complainant established a subordinate State branch of its organization in the State of Illinois known as a 'Realm' which organization was in turn

authorized to and did establish and maintain certain local branches throughout the State known as Klans. That the chief executive office of said 'Realm' organization is known as 'Grand Dragon,' and the chief executive officer thereof was, at all times herein referred to, Charles G. Palmer.

"4. That at some date subsequent to June 10th, A. D. 1923, a local 'Klan' was established and chartered at Springfield, Illinois, known as 'Abraham Lincoln Klan Number Three,' and its principal executive officials were at the time of the revocation hereinafter referred to as follows:—Charles S. Wanless, 'Exalted Cyclops' (or President), James H. Ashby, 'Kligrapp' (or Secretary), J. B. Watts, 'Klabee' (or Treasurer).

"5. That on the 4th day of March, A. D. 1924, by his official edict of that date, and pursuant to the authority vested in him by the Constitution and By-laws of the Complainant, the said Charles G. Palmer as 'Grand Dragon' revoked said charter of 'Abraham Lincoln Klan Number Three,' at Springfield, Illinois, and directed the officials and members of such 'Klan' to turn over to one O. W. Friederich, Pekin, Illinois, all property and funds belonging to Complainant.

"6. That Section 23 of Article 18 of said Constitution and By-laws of complainant provides that 'in the event the Charter of a Klan has been revoked or cancelled for any cause whatsoever, and in the event of disbandment of a Klan whether it be a chartered or provisional Klan, all moneys of that Klan in the possession of any officer or member thereof shall automatically become the actual moneys of the Imperial Treasury of this Order and same must be freely and promptly turned over on demand to the properly accredited officer who is authorized by the Imperial Wizard to receive same in the name of this order; also all books, papers, manuscripts, klorans, records, seal, Klan paraphernalia, regalia, robes, helmets, and any

and all other things used by the Klan, and all articles or things appertaining to this order as may have been used by or are in the possession of any individual member thereof,' and upon the revocation aforesaid the property and moneys of 'Abraham Lincoln Klan Number Three' automatically became the property and money of Complainant, and Complainant became entitled to the possession thereof.

"7. That Section 5, Article 19 of said Constitution and By-laws provides among other things that 'the Kligrapp is the Secretary and recording officer of the Klan—he shall make a report through the proper channels to the proper officers not later than the 10th of the month for the calendar quarter last past—and with his reports he shall remit to said officer or officers all moneys belonging to this order such as Imperial Tax, Realm or Provincial Tax, Klectokons, moneys due for supplies and any and all other moneys due and payable to said officers. He shall be the custodian of the seal of the Klan.'

"8. That Section 6, Article 19 of said Constitution and By-laws provides among other things as follows: 'The Klabee is the Treasurer of the Klan. He shall be the custodian of its funds and shall receive from the Kligrapp all moneys due to be turned over to him giving his receipt for same and keeping same apart from his personal funds and secure for the sole use of the Klan. . . .'

"9. That Section 7, Article 19 of said Constitution and By-laws provides among other things as follows: 'The Kladd is the Conductor of the Klan and the custodian of its paraphernalia and other properties . . .'

"10. That upon the revocation of the Charter as aforesaid it became and was the duty of the defendant James H. Ashby, as 'Kligrapp' (Secretary) and the defendant, J. B. Watts, as 'Klabee' (Treasurer)

to account to the complainant for all moneys of 'Abraham Lincoln Klan Number Three' then in the possession or control of said Klan or any of its officers or members, and said last named defendants should state an account showing the disposition of all such funds; and said secretary should likewise account for the seal of said 'Klan.'

"11. That upon the revocation of the Charter aforesaid it became the duty of the official known as the 'Kladd' to account to complainant for all paraphernalia and other properties belonging to said Abraham Lincoln Klan Number Three, but it does not appear from the evidence herein who was then acting as the 'Kladd' of such Klan.

"12. The Master recommends a decree in accordance with the foregoing conclusions."

To these findings, or findings and conclusions, no objections before the master or exceptions before the chancellor were made, except that the defendants James B. Watts and James H. Ashby, after reciting finding number ten, objected and excepted as follows: "Said finding was erroneous in that the evidence in this cause fails to show that there was anything due complainant by the defendants at the time of the revocation of the Charter as shown by the evidence in this case; and that the evidence shows affirmatively that there were no funds or property of any kind or character in the hands of either of these defendants, belonging to complainant for which they should account, except, the seal described in the evidence which was inadvertently in their possession and which they hereby tender into Court."

The objection was overruled by the master, made an exception before the chancellor, overruled, and a decree was entered requiring the defendants James H. Ashby and J. B. Watts, as secretary and treasurer, respectively of "Abraham Lincoln Klan No. 3," to account.

It is contended in the assignments of error on this decree that there is no evidence which would show a valid revocation of the charter of said Klan No. 3. Defendants made no such contention or objection before the master or the chancellor. On the other hand, defendants by their objection and exception to finding number ten, conceded and stated that the charter had been revoked, "as shown by the evidence," and acted upon that finding by tendering the seal to complainant in court. It has been held that on appeal from a decree finding complainant entitled to a mechanic's lien, defendant, by not filing exceptions to the master's report, will be held to have waived all objections to the claim. (*Pacyna v. Bliss,* 180 Ill. App. 351.) The same case holds that without objections all conclusions of fact are waived. Findings of fact by the master not objected to, will not be reviewed upon appeal. (*Gillett v. Chicago Title & Trust Co.,* 230 Ill. 373.) Questions depending on the weight of the evidence cannot be considered on appeal in the absence of objection and exception taken to the master's report, on which the decree is based. *Strayer v. Dickerson,* 213 Ill. 414. Where no objections are filed to the master's report finding as to the interest in the premises of one of the parties to establish a lien upon the property by virtue of a trust deed, such interest cannot be questioned on appeal. *Marks v. Chicago Mortgage Corp.,* 218 Ill. App. 1. The same rule is laid down in *Walker v. Chicago, M. and N. R. Co.,* 199 Ill. App. 610, and *Angerer v. Southern Traction Co.,* 203 Ill. App. 25.

An examination of the findings of the master indicates that each of them was a finding of a fact, except the first as to the jurisdiction of the court—about which there is no contention—and the tenth and eleventh finding. The last two findings are based upon a revocation of the charter by "Edict No. 65" of the "Grand Dragon" and it is now contended that the

granting of such power to an "Imperial Wizard" or "Grand Potentate" or "Absolute Power" to exercise without notice or a hearing, is un-American, unreasonable and void. No such question was raised before the master or before the court, and when "Edict No. 65" was offered and admitted in evidence the only objection made was that "there was no evidence" of its having been sent to or received by "Abraham Lincoln Klan No. 3." It was accepted upon the trial as a legal and lawful exercise of power on the part of the ruling authorities and the evidence was overwhelming that the edict was received by and acted upon by the powers controlling Klan No. 3.

The fifth finding of fact by the master to which no objection or exception was made, was that the Grand Dragon cancelled and revoked the charter, and the defendants, by their exception to finding ten, so recognized the fact and are now estopped to urge the assignment of error. The contention, however, in its broadest sense is, that there cannot be a corporation *sole* for charity. The mere statement of the contention is its refutation. All things are not necessarily un-American merely because they do not suit our individual taste or cater to our advantage. What was said by the court in *Gross Loge, etc. v. Brausch,* 256 Ill. 185, is applicable to this case. In corporations not for pecuniary profit, the charter and by-laws constitute a contract between the members with which courts will not interfere.

Other assignments of error were made, one being that the charter of said Klan No. 3 was never revoked, when all of the oral testimony before the master and court is conclusive that the charter was revoked and that defendants acted upon the understanding that they were no longer members of complainant corporation.

Shortly prior to March 5, 1924, the "Grand Dragon" of the "Realm" by executive order removed the "Great Titan" of "Province No. 2," and the members of "Abraham Lincoln Klan No. 3" took official action at the exact time they received notice of the cancellation of their charter, passing the following resolution:

"WHEREAS: The Great Titan of Province No. 2, Realm of Illinois, has been removed by the Grand Dragon of Illinois, for the reason that he refused to be made a party to the political betrayal of Klansmen of this State, and

"WHEREAS: Abraham Lincoln Klan No. 3, Realm of Illinois, has withdrawn from the National Organization until such time as the Imperial Palace shall take the necessary steps toward the removal of Charles G. Palmer as Grand Dragon of Illinois."

Whether the defendants were willing to acknowledge that their charter had been cancelled or personally wished to nullify it by secession from the order, would appear to be a distinction without any material difference.

Klan No. 3 of Springfield claimed to take great offense at a letter sent out on February 21, 1924, from the office of the Great Titan (personally written by Palmer) in the following form:

"IMPERIAL PALACE OF INVISIBLE EMPIRE, KNIGHTS OF THE KU KLUX KLAN, INCORPORATED, ATLANTA, GEORGIA, REALM OF ILLINOIS.

"Office of the GREAT TITAN PROVINCE No. 5, Phone Randolph 3557–3361, P. O. Box 811, Chicago, Illinois, February 21st, 1924.

G. T. No. 2,

Springfield, Ill.

Faithful and Esteemed Klansman:

"The political Activities committee of the Illinois Better Government League, is of the opinion that Judge Jenkins of Springfield is to be preferred over

Justice Dunn, as a candidate in the Third Judicial District for Supreme Court Justice.

"As I understand the matter Judge Jenkins has pledged himself to them and in line with the general political program about to be worked out he is considered the logical candidate. . . .

"It is their hope therefore that you will be able to do all you can to help Judge Jenkins to secure the support of all concerned.

"It is absolutely useless for the Political Activities committee of the League to concentrate upon any particular endeavor and then have their recommendations ignored. While the rank and file cannot be told every little in and out of the situation, those of us who are broad enough to take in their comprehensive program at a glance should be willing to co-operate with them and accept their recommendations as final. At least they have given much more time and thought to the qualifications of the respective candidates than the individual voter has, and that taken in conjunction with the additional consideration of promises made by the candidates themselves to give recognition later on, is suffice for me as an individual.

"Faithfully yours,

"In the Sacred Unfailing Bond."

And "Klan No. 3" now represent that they were opposed to the order interfering with politics in any manner. Just why they waited from February 21 to March 5, 1924, to pass the resolution of withdrawal is not made clear.

It is contended that it is not shown that the complainant order had authority to do business in the State of Illinois. This is a matter that should have been set up by defendants' answer and shown by the proof. (*Holmes v. Standard Oil Co.*, 183 Ill. 70; *Delta Bag Co. v. Kearns*, 160 Ill. App. 93; *Delta Bag Co. v. Kearns*, 253 Ill. 365.) Even if it should be conceded

that complainant was amenable to the Foreign Corporations Act, Cahill's St. ch. 32, ¶ 80 *et seq.* and acting in violation thereof, defendants (except the bank) were all members of the order and are estopped to raise that question. The charter and by-laws of complainant operate as a contract between the corporation and its members, who became members in reliance upon them, and the contract, like any other one, is not to be abrogated or set aside by construction on the ground that the performance of it would be inconvenient or unfavorable to either one of the contracting parties. (14 Corpus Juris, 346; *Cratty v. Peoria Law Library Ass'n,* 219 Ill. 516, 523; *Supreme Lodge K. of P. v. Kutscher,* 179 Ill. 340, 344; *Mandel v. Swan Land & Cattle Co.,* 51 Ill. App. 204, 209.)

We find no error in the decree of July 8, 1925, that would warrant a reversal.

On the proceedings before the master upon the accounting, it was shown that the defendants James H. Ashby, as former secretary, and J. B. Watts, as former treasurer, were responsible for the moneys of the order, which had been deposited in the First National Bank of Springfield prior to March 5, 1924, to the amount of $10,854.08, and which were carried in the bank on an account under the name of "J. B. Watts, Sec'y." At the opening of the bank on the morning of March 5, 1924, four checks were cashed, said checks having been issued by the defendants Ashby and Watts, one pretending to bear date March 1, 1924, payable to the order of said James H. Ashby for the sum of $1784; one pretending to bear date of February 29, 1924, payable to the order of Charles S. Wanless for the sum of $1175; one pretending to bear date February 27, 1924, payable to the order of J. W. Dugger for the sum of $5000; and the fourth pretending to bear date February 24, 1924, payable to the order of E. M. Coombs for the sum of $2360. It is to be noticed that these four checks are all dated in a series two days

apart on and prior to March 1, 1924. All except Coombs had been officers in Klan No. 3 and were originally made defendants to the bill of complaint. These checks were issued and pretended vouchers paid without any vote of the "Klan" as required by the constitution of the order. There was left in the bank the sum of $535.08 under the control of defendant Watts. None of these parties to whom checks were issued made any accounting of how the funds were used for the benefit of the order or "Klan No. 3." Ashby was in the printing business and testified that the check to him was in payment for printing, but no bill or items were presented and Ashby was contradicted and impeached by his partner and the records of his business. Wanless and Dugger gave no explanation of the use of the funds checked out to them. The testimony of Coombs is interesting and given under circumstances apparently free from any personal interest and very much against the interest of his employer. Coombs testifies that there was a meeting of certain Klansmen in the hall of the order on March 4, 1924; that Dugger, Wanless, Ashby, Day and others were present; that the question of the cancellation of the charter and how to preserve the funds in the bank was discussed; that at that meeting on March 4, 1924, Ashby handed him the check for $2360, and that he talked with Wanless about cashing it the minute the bank was open in the morning, and Wanless agreed to meet him at the bank at 9 o'clock in the morning; that he met Wanless at the bank at 9 o'clock the next morning and Wanless identified him and indorsed the check, and that he drew the money upon it and walked down the street about two-thirds of a block, as he was directed to do by Wanless, and met Watts and turned the money over to Watts just as he had received it. Coombs testifies that Dugger was at the bank on the same morning, March 5, 1924, cashing his check. The voucher made out in

Coombs' behalf pretended to be for the services of forty-nine precinct workers in the spring election, who were hired by Coombs. He testifies that he never employed any precinct workers or had anything to do with the election, and there is no testimony that he had. There is other testimony corroborating Coombs · as to the purpose of the meeting on March 4, and tending to show that the bills were fictitious. Witnesses testified to statements made by Watts, the treasurer, as to the amount of the funds in the bank, which were about $11,000 up to and on March 5, 1924. There was conflict in the testimony along these lines, but the fact that all four of these checks were cashed within a few minutes of each other on the morning of March 5, 1924, and that Wanless was at the bank, as shown by his signature on the Coombs check, is very strongly corroborative that the checks had not been issued previously,—one of them ten days—were colorable and the vouchers fictitious. The fund in the bank was about the amount that "Abraham Lincoln Klan No. 3" was in arrears under the by-laws to the "Imperial Realm." We are satisfied that the preponderance of the testimony in this case shows that each and all of said checks were fictitious and that the funds did not pass out of the hands of Defendants Ashby and Watts.

Section six of article nineteen of the constitution provides:

"Klabee is the treasurer of the Klan. He shall be the custodian of its funds, and shall receive from the Kligrapp all monies due to be turned over to him, giving his receipt for same, and keep same apart from his personal funds, and secure for the sole use of the Klan. He shall keep an accurate account of all monies received by him, and pay same out only on order of the Klan, signed by Exalted Cyclops and the Kligrapp, except the monies due by the Klan to the Imperial Realm and province officers, which monies do not re-

quire action of the Klan, and make a faithful record of such disbursements.''

No offer of proof of any kind is made to show that the ''Klan No. 3'' ever authorized the payment of any such vouchers.

It has been held that where a defendant is an accounting party, as one occupying a fiduciary relation, the burden of proof is on him to show the performance of his trust, and one who is liable to render an accounting has the burden of proving allowances of credit which he may claim. (Corpus Juris, Vol. 1, pages 642–3, section 129.)

The master in chancery took the testimony and saw and heard the witnesses and made his report. There was some conflict in the testimony, but we cannot say that its weight is clearly and palpably against the decree of the court. In *Schultz v. Schultz,* 274 Ill. 341, 349, in a similar case, the court held: ''The testimony is very conflicting, but we cannot say that its weight is clearly and palpably against the decree of the court. In such situation we would not be justified in reversing the decree on the evidence. *Treloar v. Hamilton,* 225 Ill. 102, and cases cited; *Miltimore v. Ferry,* 171 id. 219; *Maratta v. Anderson,* 172 id. 377.''

Finding no error in the record, the decree of the circuit court of Sangamon county is affirmed.

*Affirmed.*

### ADDITIONAL OPINION ON DENIAL OF PETITION FOR REHEARING.

Appellants and plaintiffs in error, upon petition for rehearing contend that the revocation of the charter of Abraham Lincoln Klan No. 3 involved a question of law, and that the Imperial Wizard was powerless to declare a forfeiture without giving ''the other party to the contract'' opportunity to be heard. It is fur-

ther contended that property rights were involved in the forfeiture, and that the rules and constitution of the Grand Lodge cannot deprive the courts of jurisdiction to determine property rights. It is contended that the rules and constitution of the parent organization are unreasonable and void; that the findings of the master involved questions of law to which appellants and plaintiffs in error were not bound to except, and that this court has not passed upon these questions.

It is conceded in the proofs that appellants and Abraham Lincoln Klan No. 3 violated the rules and constitution of the order in failing and refusing to pay dues, and that the rules of the order, in such event, provided for forfeiture. The preponderance of the proof further shows that Abraham Lincoln Klan No. 3 had seceded from the order. This Klan organization was incorporated under the law, not for pecuniary profit, and as to the reasonableness of its laws, rules and constitution courts are not concerned and will not attempt a determination. (*Christian Church of Sand Creek v. Church of Christ,* 219 Ill. 503, 515.) And when appellants seceded from the parent organization they abandoned all interest in the property which belonged to the Ku Klux Klan. (*Christian Church of Sand Creek v. Church of Christ, supra.*)

The contention here raised was not raised in the lower court. Appellants brought the seal of the subordinate corporation into court and delivered it up and the cause was tried on the issue that appellants had no moneys or funds belonging to appellee. The facts warranting a cancellation of the charter under the rules and constitution are conceded, but appellants insist that there is no power to cancel, except upon notice and a hearing. The cases cited to support appellants' contention are all from other states, and, so far as we have examined, all of them involve a property right, based upon a policy of insurance upon

which the parent organization is bound, or a special trust fund which the subordinate lodge was incorporated to administer. (*Watchell v. Widows and Orphans Society*, 84 N. Y. 28; *Ludowiski v. Polish Roman Catholic Benevolent Society*, 29 Mo. App. 337; *Grand Court Foresters v. Court Cavour No. 133*, 83 N. J. Eq. 343.) In *Austin v. Searing*, 16 N. Y. (Court of Appeals), 112, the question apparently arose nearly 100 years ago over the right of the subordinate body to insist upon a reinstatement that was provided for in the by-laws. No such questions are raised in the case at bar. No purpose of appellee's existence is suggested, except to maintain a principle. Whether such principle is religious, economic or patriotic, is not for courts to determine and would make no material difference if determined. The government of appellee order, as shown by the constitution and its by-laws, is autocratic and sole, but its actions and conduct are not for that reason unreasonable and void. It is held in Corpus Juris, vol. 14, page 72:

"The legislature has power, in the absence of constitutional restrictions, to permit one person, or his successor, to exercise all the corporate powers, and to make his acts, when acting on the subject matter of the corporation, and within its sphere of action and grant of powers, the acts of the corporation. *Penobscot Boom Corp. v. Lamson*, 16 Maine, 224, 33 Am. D. 656."

In this State religious corporations are based upon the usages and customs of the particular denomination or synod seeking corporate power, and the exercise of that power and the manner thereof frequently is a part of the religious belief. That it is exercised autocratically or by a corporation sole, has never been held to be against the public policy of this state. Neither the legislature by enactment nor the courts by construction in this State have ever held that social

or religious affairs of the people should be free or equal, and the court held in *Christian Church of Sand Creek v. Church of Christ, supra,* on page 512: "It is not, therefore, within the province of this court to pronounce judgment upon the doctrines taught by Alexander Campbell and believed and practiced by his followers, or to determine which faction of the Sand Creek congregation, in their practices in their church congregation, from an ecclesiastical standpoint, is correct, as the courts have no concern with the questions whether a religious congregation is progressive or conservative; whether a musical instrument shall be present or absent during church services; whether the preacher shall be selected from the congregation or shall be a person employed by the congregation for a stated time at a stated salary; whether missionary societies and Sunday schools shall have separate organizations from the church congregations or not, or whether the funds necessary for the support of the church shall be contributed wholly by its members or raised in part by fairs and festivals. All those questions, and kindred questions, must be left to the determination of the church congregation."

Neither is appellee, incorporated in another state, prohibited from bringing suit in this State, under the corporation act passed in 1919 and the amendments thereto. (*American Guaranty Co. v. State Bank of East Lynn,* 244 Ill. App. 16.)

In conclusion, appellants have no property right involved in the cancellation of the charter of Abraham Lincoln Klan No. 3. (*Pitcher v. Board of Trade,* 121 Ill. 412.) Appellee is a corporation organized under and by virtue of a decree of a court of general jurisdiction in the State of Georgia. Appellants became members of this association by agreeing to abide by and conform to all of the laws, rules and regulations of the order. The laws and rules of which they com-

plain are of their own choosing, and courts are power-less to aid them. (*Fisher v. Board of Trade of City of Chicago,* 80 Ill. 85; *Baxter v. Board of Trade of City of Chicago,* 83 Ill. 146; *Sturges v. Board of Trade of City of Chicago,* 86 Ill. 441.)

The petition for a rehearing is denied.

*Denied.*